71997. LYONS et al. v. GEORGIA STATE INDEMNIFICATION COMMISSION.
(346 SE2d 828)

BANKE, Chief Judge.

The appellants applied to the Georgia State Indemnification Commission to be indemnified for the death of their father, a former guard at the Georgia State Prison in Reidsville, who died of a sudden heart attack in April of 1982, two days after being attacked and robbed by two inmates while on duty at the prison. The commission denied the application for indemnification, and that decision was upheld by the Superior Court of Fulton County on appeal. The case is currently before us following our grant of the appellants' application for discretionary appeal.

The decedent was described as being in a high-risk category for a sudden heart attack due to pre-existing heart disease, hypertension, and emphysema. He had in fact suffered a previous heart attack several years earlier, prior to obtaining employment as a prison guard; however, since beginning such employment in September of 1976, he had enjoyed relatively good health, having used his sick leave on only one occasion.

On Saturday, April 3, 1982, while ushering some prisoners back to the cell area following the evening meal, the decedent was attacked from behind by two hooded inmates, who forced him to the floor, dragged him into a hall bathroom, and robbed him of the money in his wallet. The decedent was examined shortly thereafter by a prison physician, at which time his blood pressure registered 226 over 110,

which the physician described as greatly elevated. The physician administered medication to the decedent to lower his blood pressure and, in his written medical report, described the decedent's "present condition" as follows: "Bad; shaking could have a heart attack." Against the advice of the physician, the decedent then drove himself to his home in Metter, Georgia, some 50 miles away.

A Metter police officer testified that he observed the decedent sitting inside his car on the side of the road on the evening in question, "with his head down on the steering wheel." The officer stated that when he approached the car, the decedent "raised up and shook his head" and drove off in the direction of Metter, apparently without seeing him.

Upon arriving home, the decedent described the incident at the prison to his wife, telling her that the two inmates had beaten him, kicked him, stood on his chest and back with their knees, choked him, torn his clothes, and taken his money. A neighbor who was a nurse was called to the home at this time to look at the decedent. She testified that she found him lying on the sofa in the following condition: "listless, shaky, his hands, you know, trembling. And there was a tremor about his voice when he spoke. He complained about hurting all over, especially in his neck."

The decedent was taken to the hospital later that evening by his wife. His blood pressure at that time measured 206 over 118. After being given medication for his nerves and for pain, he was discharged with instructions to consult his personal physician promptly. Upon his arrival back at home, he suffered a dizzy spell and collapsed on the bed, where he remained for the remainder of the night. He continued to stay in bed virtually all of the following day, Sunday, still complaining of pain in the neck, back, chest, and shoulder. That night he slept restlessly and "coughed quite a bit."

At 9:00 a.m. on Monday, the decedent was taken to the office of his personal physician, Dr. Pence. Dr. Pence testified that the decedent appeared calm at this time and that his blood pressure was a mere 170 over 110, which Dr. Pence described as not dangerously elevated. Dr. Pence nevertheless prescribed additional medication to lower the decedent's blood pressure, as well as additional medication for pain.

On Monday evening, one of the decedent's neighbors came to visit him. The decedent initially appeared to the neighbor to be "calm" and "his usual self"; however, as the decedent began to relate what had happened to him at the prison two days earlier, he began coughing and gasping for breath. The neighbor testified that the decedent "seemed to be reliving that incident," stating, "I felt like whatever he felt at the time was happening, he was feeling in that living room at that time. It was — he was telling it with a lot of inten-

sity. And from that, came the coughs." The decedent was immediately transported to the hospital, where he was observed upon arrival to be very short of breath and sweating profusely. He suffered cardiac arrest and died while being taken to the intensive care unit.

There was extensive medical testimony in the case with respect to the cause of death. Dr. William Mullis, who performed an autopsy the next day at the request of Dr. Pence, determined the cause of death to be "acute pulmonary edema," a condition wherein the air sacs in the lung fill with fluid, making it impossible for the exchange of oxygen and carbon dioxide to take place. He testified that the most common cause of pulmonary edema, and the cause in this instance, was the failure of the heart to pump blood effectively.

Asked specifically to offer an opinion as to whether the "scuffle" the decedent had been involved in at the prison two days earlier was "related to" the death, Dr. Mullins responded that the only physical evidence of a struggle which was apparent from an examination of the body was a small bruise or hematoma on the right arm and that this injury could not have caused the decedent's death. Asked, "What evidence would you have found if the events two days prior to his death had triggered that death?" he responded, "We would have found more bruising of the heart, lungs, liver, or some of the other internal organs. We would have found bruises or hemorrhages and maybe a broken bone, but we didn't find any." While conceding that mental and emotional stress increase the chance for elevation of blood pressure in persons with high blood pressure and increase the incidence of death in persons with pre-existing heart disease, Dr. Mullins stood by the conclusion contained in this autopsy report that "[t]here was no evidence that the scuffle had any bearing on the cause of death."

While acknowledging that the "scuffle" at the prison might have contributed to the decedent's death, the decedent's personal physician, Dr. Pence, expressed his agreement with Dr. Mullins, testifying, "I just don't see how [it] caused this pulmonary edema." However, Dr. Joseph Burton, an expert in forensic pathology retained by the appellants reached a different conclusion, based on an examination of the medical records, the autopsy report, Dr. Mullins' deposition, the deposition of the prison physician, and the deposition and statements of the decedent's wife. While expressing agreement with Dr. Mullins' opinion that physical trauma had played no direct role in the decedent's death, Dr. Burton testified that he believed the emotional stress and trauma produced by the assault had been a contributing factor. He drew a distinction between the "causation of death" and the immediate "mechanism of death," stating, in effect, that while the immediate mechanism of death was, as the autopsy report demonstrated, cardiac arrest resulting from pulmonary edema, that mechanism had been triggered by the emotional trauma associated with the

assault at the prison.

After reviewing the evidence, the special master appointed by the commission expressed himself "unable to find that a natural inference through human experience had been raised to indicate that the April 3rd incident or any exertion or stress related to [the decedent's] job contributed to his cardiac arrest." Looking, therefore, to the medical testimony, he found it to be in conflict; and, concluding that "the more persuasive and convincing testimony is that of the physicians who actually saw the deceased, Doctors Pence and Mullins," he accordingly found that "[the decedent's] cardiac arrest [was] not attributable to his performance of duty but rather arose from natural causes." *Held*:

OCGA § 45-9-85 provides, in pertinent part, as follows: "(a) The indemnification shall be paid by the commission when a law enforcement officer, fireman, or prison guard, while engaged in the performance of his duties: (1) Is killed or receives bodily injury which results in death within 12 months thereafter, if such killing does not occur from natural causes while performing routine duties which would not be strenuous or dangerous if performed by citizens who are not law enforcement officers, firemen, or prison guards, and if such killing is not the result of suicide and if such bodily injury is not intentionally self-inflicted. . . ."

The state contends that, pursuant to the express terms, the code section authorizes recovery only upon proof that the death was the direct result of "bodily injury" sustained during performance of official duties. However, we believe that the special master was correct in rejecting such a narrow construction and adopting a more liberal interpretation, so as to effectuate the humane purposes for which the statute was obviously enacted. Accord *City of Macon v. Herrington*, 198 Ga. 576 (2) (32 SE2d 517) (1944); *Lumbermen's Mut. Cas. Co. v. Griggs*, 190 Ga. 277, 287 (9 SE2d 84) (1940); *Employees Retirement System of Ga. v. Baughman*, 241 Ga. 339, 341 (2) (245 SE2d 282) (1978). We thus agree with the special master's conclusion that recovery would be authorized under the statute upon a showing that "exertion in the performance of [the decedent's] duties aggravated his pre-existing condition . . . or contributed to the cardiac arrest." Cf. *Maddox v. Buice Transfer &c. Co.*, 81 Ga. App. 503, 505 (59 SE2d 329) (1950).

We part company with the special master, the commission, and the superior court, however, in their conclusion that the evidence in this case does not give rise to a natural inference through human experience that the assault at the prison contributed to the decedent's heart attack. The special master based his conclusion in this regard on the decedent's neighbor's testimony that the decedent had appeared to be calm immediately prior to retelling the story of the

prison assault, combined with the evidence that his blood pressure readings had dropped steadily since the immediate aftermath of the event — to the point where, according to Dr. Pence, it was no longer dangerously elevated. However, we do not find either of these factors to be inconsistent with the clear evidence that the decedent had not fully recovered from the effects of the assault, it being undisputed that, despite the various medications which had been administered to him and despite his having rested at home for virtually all of the two days since the assault, his blood pressure still had not returned to normal. Furthermore, in view of the fact that the series of symptoms, including coughing, sweating, and shortness of breath, which immediately preceded the decedent's death occurred as he began retelling the story of the incident to his neighbor, it is quite obvious that the outward appearance of calm displayed by him belied his actual emotional state.

In our view, the *only* rational inference which can be drawn from the evidence in this case is that the emotional stress suffered by the decedent as a result of the assault had not completely subsided and was a contributing factor in his death. We do not find Dr. Mullins' testimony to be inconsistent with such an inference, since it was clearly directed to the narrow issue of whether the decedent had suffered any *physical* injury which might have contributed to his death. We consequently reverse the judgment of the superior court, with direction that the commission be ordered to grant the appellants' application for statutory indemnification.

*Judgment reversed and case remanded. Deen, P. J., McMurray, P. J., Pope, and Benham, JJ., concur. Birdsong, P. J., Carley, Sognier, and Beasley, JJ., dissent.*

BIRDSONG, Presiding Judge, dissenting.

I must respectfully enter my dissent to the reversal in this case and the underlying reasoning leading to this action.

This case involves the payment of death benefits to the survivors of a state employee who died from acute pulmonary edema. The only real issue in the case is whether Brown died as the result of an undisputed pre-existing medical condition that placed him in a high risk category of suffering a cardiac arrest, i.e., of natural causes caused by a pre-existing serious medical defect or whether the stress of the physical assault and threats of death at the hands of two prisoners two days before death was the precipitating cause of the cardiac arrest that led to Brown's death by acute pulmonary edema.

The direct cause of death is not disputed. The precipitating stress or absence thereof that led to death was in great conflict and arose out of the disagreement between three physicians. Two physicians who had treated the deceased personally and observed his phys-

ical and mental condition during the days before his death concluded that neither the stress nor the physical incident of the assault was the precipitating cause of death. The third doctor, based on numerous reports including those of the examining physicians, concluded that it was likely the stress manifested by Brown (and thus indicative of his continuing physical condition) when describing the incident to a neighbor did in fact lead to the cardiac arrest and death by acute pulmonary edema.

In his findings of fact, the Special Master found: "22. The medical evidence herein is conflicting. Dr. Pence, who examined and treated Mr. Brown and Dr. Mullins, who performed the autopsy on Mr. Brown, both expressed the opinion that the prison incident did not contribute to Mr. Brown's death. . . . Dr. Burton, an experienced forensic pathologist who did not see Mr. Brown either living or dead, believes that the [stress brought on by the] prison incident was a direct cause of Mr. Brown's death. . . . The reason for Dr. Burton's opinion is apparently his feeling that Mr. Brown never regained his health, well-being or lifestyle after the incident. . . . There is no indication in the record that Dr. Burton was aware of the opinions of Mr. Hodges and Dr. Pence that Mr. Brown was calm on Monday, April 5 and that he seemed to be his old self.

"23. The Special Master finds that the more persuasive and convincing testimony is that of the physicians who actually saw the deceased, Doctors Pence and Mullins, and therefore finds that Mr. Brown's cardiac arrest is not attributable to his performance of duty but rather arose from natural causes."

The majority disagrees with this finding of the Special Master because the facts before the Special Master give rise to a natural inference through human experience that the assault at the prison contributed to the cardiac arrest. The majority bases this conclusion on the evidence that two days after the assault, Brown's blood pressure had not returned to normal and Brown exhibited physical symptoms (coughing, sweating and shortness of breath) immediately prior to death when recounting the circumstances of the assault. The majority, in considering this evidence, finds the only rational inference to be that emotional stress arising from the assault precipitated death.

I do not disagree that the evidence fully supports the conclusions drawn from the evidence by the majority. My problem with those conclusions is that the very same evidence was considered by the Special Master. For apparently valid reasons, the Special Master concluded the conclusion now drawn by the majority was not the most convincing.

The majority does not urge that the Special Master erred in the application of any principle of law or that there was no evidence as a matter of law to support the conclusion reached by the Special

matter of law to support the conclusion reached by the Special Master. Rather the majority reviews all the evidence and concludes that there is only *one* rational conclusion to be reached, i.e., the death was the direct result of stress, a conclusion considered and rejected by the Special Master. This, I conclude, is a reweighing of evidence and a fresh though different conclusion.

The statute giving the right to make a claim for compensation under the aegis of an administrative body provides in pertinent part that: "The court shall not substitute its judgment for that of the [agency] as to the weight of the evidence on questions of fact." OCGA § 45-20-9 (m). It is only where the administrative body has applied a "clearly erroneous" standard that this court or any reviewing court may apply any ruling other than the "any evidence" rule in determining the presence of error. Thus even assuming (arguendo) that the findings of fact contended for by the claimants (and found by the majority) would have been authorized by the evidence presented on the trial, yet where the facts found by the Special Master were authorized under some credible evidence such findings must not be set aside. *Brook Forest Enterprises v. Paulding County*, 231 Ga. 695 (203 SE2d 860). This court is precluded from conducting a de novo determination of evidentiary questions. *Hall v. Ault*, 240 Ga. 585, 586 (242 SE2d 101); *Georgia Dept. of Human Resources v. Holland*, 133 Ga. App. 616, 617 (1) (211 SE2d 635). I submit that is what the majority has done in this case. Accordingly applying the any evidence rule, I would affirm the judgment of the superior court.

I respectfully dissent.

I am authorized to state that Judge Carley, Judge Sognier, and Judge Beasley join in this dissent.

DECIDED MARCH 20, 1986 —
REHEARING DENIED APRIL 14, 1986 —

*Bensonetta T. Lane*, for appellants.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Jeffrey C. Baxter, Assistant Attorney General*, for appellee.